IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JAMES J. STEGGALL,<br><br>Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | 7:18CV5000<br><br>MEMORANDUM AND ORDER |

Plaintiff, James Steggall ("Steggall") has asserted a claim under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., alleging that he slipped and fell on ice in Defendant BNSF Railway Company's ("BNSF") Alliance, Nebraska railyard and sustained injuries.

This matter is before the court on BNSF's motion to exclude testimony of Steggall's retained expert, Brian Hansen ("Hansen") (Filing No. 52), and BNSF's motion for summary judgment (Filing No. 55). For the reasons discussed below, the defendant's motion to exclude testimony will be granted. Defendant's motion for summary judgment will be granted in part, and denied in part.

I. BACKGROUND

Steggall is a former employee of BNSF and its predecessor in interest, Burlington Northern. He began working for the company in 1972 and retired in February 2018. (Filing No. 57-1 at CM/ECF pp. 3, 7).

Steggall alleges that on January 4, 2015, he "slipped and fell on ice resulting in serious and permanent injury to his left hip, left elbow, back, neck and body." ([Filing No. 1 at CM/ECF p. 2](Filing No. 1 at CM/ECF p. 2)). He alleges his fall occurred as he was performing work in the course of his duties as a foreman in the Maintenance of Way Department for BNSF. (Id. at CM/ECF pp. 1-2)

On the day of the fall, Steggall arrived at the Alliance Railyard at 5:30 a.m. and worked a 12-hour shift. At the end of his shift, Jeremy Wegner, a roadmaster working at the Alliance yard, asked a small group of employees if one of them would return to the yard to turn off a piece of equipment known as a jet blower. ([Filing No. 63-4 at CM/ECF p. 11](Filing No. 63-4 at CM/ECF p. 11), [Filing No. 57-1 at CM/ECF p. 13](Filing No. 57-1 at CM/ECF p. 13)) Steggall volunteered to do it. He parked his truck near the jet blower, walked to it and turned it off. ([Filing No. 57-1 at CM/ECF p. 13](Filing No. 57-1 at CM/ECF p. 13)). Steggall walked back to his truck, opened the door and put his right leg up into the cab. His left leg slipped, and he fell. (Id.)

Steggall alleges that BNSF negligently and carelessly failed to provide Plaintiff with a safe place to work by committing enumerated negligent acts or omissions. ([Filing No. 1 at CM/ECF pp. 2-3](Filing No. 1 at CM/ECF pp. 2-3)). He alleges that in addition to his injuries, he incurred pain and suffering, medical and hospital expenses, and inconvenience, anguish, and disability as a direct and proximate cause of BNSF's negligent acts or omissions.

The facts relevant to each of the pending motions will be discussed, below.

## II. ANALYSIS

### A. MOTION TO EXCLUDE EXPERT WITNESS

#### i. Background

Steggall disclosed Hansen as a retained expert. Hansen is a retired Union Pacific Railroad Company employee who held several positions related to track welding and maintenance. ([Filing No. 54-1 at CM/ECF p. 22](Filing No. 54-1 at CM/ECF p. 22), [Filing No. 54-5 at](Filing No. 54-5 at)

CM/ECF pp. 1-2). Hansen now provides expert consulting services exclusively for railroad litigation matters.

Hansen concluded that BNSF failed to provide Steggall a reasonably safe work environment on or about January 4, 2015. (Filing No. 54-1 at CM/ECF pp. 18-19). Specifically, he opined that:

- BNSF Railway failed to comply with its Winter Safety Bulletins and Preparedness Plans by making sure that the walking surfaces at the parking lot area were cleared of ice and snow and treated with de-icers such as sand or salt, or the area was shut down until conditions improved.
- BNSF Railway failed to comply with BNSF Maintenance of Way Safety Rules that require employees must participate in a Job Safety Briefing before beginning work and when work or job conditions change that includes a discussion of the existing or potential hazards and ways to eliminate or protect against hazards, review of the potential for slips, trips and falls, correct methods for walking in snowy and icy conditions and the correct methods for getting on and off equipment.
- BNSF Railway failed to comply with BNSF Maintenance of Way Safety Rules that require co-workers such as Mr. Steggall be warned of all unsafe practices and/or conditions and that warning signs, placards or cones be placed at an area identified as posing potential hazards.
- BNSF Railway failed to comply with BNSF Maintenance of Way Operating Rules and its Safety Vision that require its property be kept in a safe condition and that all known hazards in the work environment will be eliminated or safeguarded.
- BNSF Railway failed to comply with the standards of care that are the custom and practice in the industry and of BNSF Railway, which include:

- o BNSF Safety Briefing Winter Preparedness Action Plans and Safety Briefing Bulletins and Reminders;
- o BNSF Railway Slip, Trip, Fall Prevention Guidelines;
- o BNSF Maintenance of Way Operating Rule 1.24;
- o BNSF Maintenance of Way Safety Rules 5-1.1., 5-1.2.4, S-1.2.6 and S-25.1

Id. at 19. Hansen intends to offer his expert opinion based on his prior work experience, his review of the materials and information and the "specialized knowledge and technical training of all aspects of Railway Engineering as it relates to this case." (Filing No. 54-1 at CM/ECF p. 10).

ii. Analysis

BNSF alleges the pleadings, depositions, and discovery materials show that Hansen's expert testimony must be precluded pursuant to Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). (Filing No. 52). Steggall opposes BNSF's motion, alleging that the Rule 702 inquiry is a "flexible one," and any doubts as to the admissibility of expert testimony "should be resolved in favor of admission." (Filing No. 61 at CM/ECF pp. 4-5).

Pursuant to Daubert, the district court must fulfill a gatekeeper role of screening expert testimony for relevance and reliability. Daubert, 509 U.S. at 591-93. see also Margolies v. McCleary, Inc., 447 F.3d 1115, 1120 (8th Cir. 2006). The proponent of proposed expert testimony must prove, by a preponderance of the evidence, that the testimony is admissible under Rule 702 of the Federal Rules of Evidence. (Daubert at 592).

Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

a. The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   b. The testimony is based on sufficient facts or data;
   c. The testimony is the product of reliable principles and methods; and
   d. The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The objective of the Daubert inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Am. Auto. Ins. Co. v. Omega Flex, Inc., 783 F.3d 720, 722 (8th Cir. 2015).

*Daubert* established a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony, including whether the theory or technique can and has been tested, whether it has been subjected to peer review, whether there is a high known or potential rate of error, and whether the theory or technique enjoys general acceptance within a relevant scientific community. *See* U.S. v. Holmes, 751 F.3d 846, 850 (8th Cir. 2014) (citing Daubert, 509 U.S. at 592-94). And for the purposes of evaluating the relevance of expert testimony, the Court must determine whether the expert's reasoning or methodology was applied properly to the facts at issue. Daubert, 509 U.S. at 580. To that end, expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006).

In this case, BNSF argues: (1) the expert testimony is not based on reliable principles and methods; and (2) lay people can understand the concepts involved

in this case and the expert possesses no specialized knowledge concerning ice/snow removal in a railyard.

Steggall argues that "Hansen's opinions are reliable because they are firmly grounded in accepted methodology." ([Filing No. 61 at CM/ECF p. 10](Filing No. 61 at CM/ECF p. 10)). However, this general statement is not supported in detail in his brief and is not supported by the evidence in the record. Rather, Steggall asserts that Hansen reviewed Steggall's statement, fact witnesses' discovery depositions, and photographs of the railyard, evaluated the information and applied "his 25 years of railroad experience, including 20 years working for the Union Pacific RR, his training and education to arrive at his opinions." ([Filing No. 61 at CM/ECF p. 11](Filing No. 61 at CM/ECF p. 11)). He argues that Hansen used "a straightforward analysis common to his profession to arrive at his opinion, and there is no need to apply the *Daubert* factors in a rigid manner." (Id.)

The Daubert standard governs the application of Rule 702 and applies to FELA and non-FELA actions. See [Claar v. Burlington Northern R. Co., 29 F. 3d 499 (9th Cir. 1994)](Claar v. Burlington Northern R. Co., 29 F. 3d 499 (9th Cir. 1994)). Though couched as an expert opinion, Hansen's opinions regarding BNSF's compliance with internal policies and procedures are based upon his railroad experience, not on any scientific theory, technique or methodology. Although Hansen has many years of experience working for Union Pacific Railroad, Hansen does not have "specialized knowledge" related to the subject matter of this case. Hansen has not received any specific training related to snow and ice removal, he did not develop a hypothesis and test it using scientific methodology, and he has not testified in other cases as an expert regarding snowy or icy conditions. ([Filing No. 63-5 at CM/ECF p. 18](Filing No. 63-5 at CM/ECF p. 18)) ([Filing No. 54-3 at CM/ECF p. 6](Filing No. 54-3 at CM/ECF p. 6)) ([Filing No. 63-5 at CM/ECF pp. 15-16](Filing No. 63-5 at CM/ECF pp. 15-16)). These factors weigh against admission of Hansen's testimony.

Hansen's opinions related to removal of snow, placement of warning cones, and which area or areas of the BNSF property are subject to the applicable rules do not relate to scientific, technical, or other specialized knowledge beyond the province of a lay juror. In his deposition, Hansen testified that the BNSF safety plan, known as the "Winter Action Plan" is "all very understandable," and a jury would be "able to determine whether or not the snow and ice was cleared from the parking lot of the shop." (Filing No. 63-5 at CM/ECF p. 19). In addition, Hansen agreed that the jury would be able to: (1) hear Steggall's testimony; (2) hear Wegner's testimony and/or the testimony of other BNSF employees; and (3) review the same documents Hansen reviewed in forming his opinions. (Filing No. 54-3 at CM/ECF p. 9, Filing No. 53 at CM/ECF p. 3).

"[W]hen the layman juror would be able to make a common sense determination of the issue without the technical aid of such an expert, the expert testimony should be excluded as superfluous." U.S. v. Kime, 99 F.3d 870, 884 (8th Cir. 1996). BNSF argues, and I agree, that the jury is well-qualified to determine whether BNSF met its obligations under the Winter Action Plan and its other policies and procedures. Hansen's testimony on these issues will be excluded.

Hansen also concluded that BNSF Railway failed to comply with BNSF Maintenance of Way Safety Rules that require employees to participate in a Job Safety Briefing before beginning work and when work or job conditions change. Wegner testified that a mandatory safety briefing occurs at the start of each shift and when there is inclement weather, and a safety briefing would have occurred on the day of the fall. (Filing No. 63-4 at CM/ECF p. 9).

Hansen's report indicates that Steggall told him that no job safety briefing was provided on the day of the fall and he took Steggall at his word that no safety briefing was provided. (Filing No. 54-1 at CM/ECF p.11) Thus, Hansen concluded that BSNF failed to comply with BNSF Maintenance of Way Safety Rules requiring

7

workers to be warned of all unsafe practices and/or conditions and that warning signs, placards or cones be placed where potential hazards exist. (Filing No 54-1 at CM/ECF p. 19)

Hansen testified that he was familiar with Steggall's deposition, in which Steggall testified that Wegner gave a job safety briefing on the day of the fall. ([Filing No. 54-3 at CM/ECF p. 16](#)). Regardless, Hansen stated that, in his opinion, further safety briefings were necessary at the end of the Steggall's shift, shortly before the fall. (Id.) When asked, he indicated that he did not know whether the conditions had changed after the first briefing, yet he still concluded that BNSF had breached its duty. (Id. At 16-17).

As previously discussed, Hansen agreed that jurors would be capable of reading and understanding the BNSF policies. It is within the province of the jury to make a commonsense determination regarding the evidence of the conditions and whether safety briefings were held appropriately for the conditions. Hansen's testimony on this issue should be excluded.

I find that Hansen's proposed testimony is not truly expert in nature. A Nebraska juror is able to decide whether the railroad was negligent in removing snow on the date of the accident, and whether its bulletins, plans, and rules were appropriate under the then-existing weather circumstances and, in the exercise of reasonable care, followed that day. Moreover, Hansen's conclusions on these issues are not the product of reliable principles and methods in the relevant field. [Fed. R. Evid. 702](#). His opinions will not be afforded the moniker of "expert" on matters a lay juror can understand, and admitting Hansen's opinions into evidence as expert testimony would invade the province of the jury and violate both Rules 702 and 403 of the Federal Rules of Evidence. Hansen will not be permitted to testify as an expert witness at trial.

B. Motion For Summary Judgment

i. Duty to Provide a Safe Place to Work

a. Background

On January 4, 2015, Steggall began a 12-hour shift, reporting to the BNSF main facility building in the Alliance Yard known as the Wagoner Building. (Filing No. 57-1 at CM/ECF p. 8). He was assigned the task of leading three outside contractors throughout the yard to clean track switches. (Id. at 9). He reported back to the Wagoner Building toward the end of his shift and was asked to turn off a piece of machinery known as a jet blower. (Id.) The jet blower was stored outside of the work equipment building in the yard. Steggall parked outside of the building, approximately 20-40 feet from the jet blower. (Id. at 13, Filing No. 61-1 at CM/ECF p. 32) After turning off the jet blower, Steggall returned to his truck and as he as getting into the truck, he slipped and fell. (Filing No. 57-1 at CM/ECF p. 15). Photographs of the work equipment building depict snow-covered ground. (Filing No. 63-2).

In his complaint, Steggall alleged:

BNSF negligently and carelessly failed to provide Plaintiff with a safe place to work by committing one or more of the following negligent acts or omissions:

a. Failed to adapt, install implement and enforce a safe method and procedure for the described operation;

b. Failed to properly inspect, maintain, and process its trucks, equipment, and appliances, so that the same became hazardous to the safe working conditions of its employees;

c. Failed to provide a safe and suitable method of clearing of ice and snow from its Alliance Terminal Yard;

d.  Failed to provide safe and suitable machinery and equipment to remove ice and snow from its Alliance Terminal Yard, resulting in a dangerous and hazardous work environment;

e.  Failed to provide sufficient personnel to safely and effectively remove ice and snow from its Alliance Terminal Yard.

f.  Failed to properly instruct Plaintiff concerning a safe method and procedure for removing snow and ice from its Alliance Terminal Yard;

g.  Carelessly and negligently failed to warn Plaintiff of hazardous conditions in its Alliance Terminal Yard, including the presence of snow and ice;

h.  Failed to supervise employees in the removal and treatment of snow and ice in its Alliance Terminal Yard.

i.  Failed to provide a reasonably safe ingress and egress to the workplace in its Alliance Terminal Yard when it knew or should have known and foreseen that ice and snow would expose employees to jeopardy of injury.

j.  Otherwise failed to exercise ordinary care to provide Plaintiff with a safe place to work.

([Filing No. 1 at CM/ECF p. 2-3](#))

It is undisputed that BNSF has a safety plan in place, known as the Winter Action Plan. This plan dictates the appropriate action required when snow accumulates in the railyard, by the number of inches in a defined time period. The Plan also assigns priority to snow removal in certain areas of the property.

In support of its motion for summary judgment, BNSF argues that Steggall has presented no evidence showing BNSF breached its duty to provide a reasonably safe workplace, and it alleges that the following facts are undisputed: (1) BNSF provided tools and training to assist with removing snow/ice around the rail yard; (2) BNSF implemented and followed a detailed Winter Action Plan which provided for snow/ice removal in the rail yard; (3) BNSF regularly warned Plaintiff

to be watchful of slippery and ice conditions; and (4) BNSF provided Plaintiff enhanced traction footwear. (Filing No. 56 at CM/ECF pp. 1-2). As a result, BNSF argues no reasonable juror could conclude that it breached the duty owed under the FELA, and it is therefore entitled to summary judgment.

In response, Steggall alleges that the area where he fell is an area that should have been cleared under the Plan. (Filing No. 63 at CM/ECF p. 5). Steggall asserts "exactly what areas BNSF was to have cleared and in turn did clear of snow, is a question of fact." (Filing No. 63 at CM/ECF p. 10). Additionally, he argues "Whether BNSF exercised reasonable care in light of its own internal safety rules are questions of fact upon which reasonable jurors can differ." (Id.) Thus, he argues the merits of this case should be decided by a jury.

### b. Analysis

A party is entitled to summary judgment if they show "there is no genuine dispute as to any material fact" and the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A railroad has a duty to provide its employees with a safe place to work. Shenker v. Baltimore & Ohio R.R. Co., 374 U.S. 1, 7, (1963). The railroad is held to the standard of what a reasonable and prudent person would have done under the circumstances. Stone v. New York, C., & St. L. R.R. Co., 344 U.S. 407 (1953). If "fair-minded men" could reach different conclusions on whether the railroad was negligent, it is appropriate to leave the issue to the jury. Id. at 409. In addition, "[t]he Supreme Court has consistently held that the issue of negligence must be resolved by the jury." McDonald v. Ne. Illinois Reg'l, 249 F. Supp. 2d 1051, 1054–56 (N.D. Ill. 2003), citing Barrett v. Toledo, Peoria W. R.R. Co., 334 F.2d 803 (7th Cir.1964); See Wilkerson v. McCarthy, 69 S.Ct. 413 (1949) (where jury trials are

required, courts must submit the issues of negligence to a jury if evidence might justify a finding either way on those issues.).

Without dispute, BNSF has policies in place which take effect under certain weather-related conditions, but there are genuine disputes as to the material facts in this case. Therefore, the ultimate question of whether BNSF breached its duty to provide its employees a safe place to work must be decided by a jury. BNSF's motion for summary judgment on the issue of liability will be denied.

### ii. Lower Back Injury

#### a. Background

Steggall's complaint alleges his fall on January 4, 2015 caused serious and permanent injury to his left hip, left elbow, back, neck, and body. (Filing No. 1). Dr. Timothy Friedlein treated Steggall's hip fracture following the January 4, 2015 fall. In his deposition, he stated that he did not intend to offer any opinion as to injuries to any other part of Steggall's body. (Filing No. 57-18 at CM/ECF p. 3).

From November 2016 until July 24, 2017, Plaintiff visited RWPC Neurosurgery and saw Dr. Raqeeb Haque and Nurse Practitioner Mary Schweitzer for his back pain that he then claimed was from the fall. (Filing No. 57-19 at CM/ECF p. 1). Medical records confirm that he complained of back pain, identifying January 4, 2015 as the date of onset. Id. Based on the medical records, the treating medical providers at RWPC provided no opinion as to causation. (Id,) On April 2, 2019, BNSF sought leave to supplement its brief in support of its motion for summary judgment. (Filing No. 71). BNSF presented Haque's deposition testimony, in which Haque was asked whether he would be "able to say, to a reasonable degree of medical probability, whether Mr. Steggall's back pain was caused by this January 2015 incident[.]" Haque replied "I can't. I don't think so." (Filing No. 71-2 at CM/ECF p. 56).

In September 2017, on referral from Schweitzer, Steggall visited the Front Range Center for Brain and Spine Surgery to see Dr. Donn Turner, for a neurosurgical consultation. (Filing No. 57-20 at CM/ECF p. 1) Steggall reported to Turner that the back pain started two years previously when he fractured his hip. Turner recommended injections to provide relief of Steggall's symptoms. He did not recommend operative intervention. (Id., at pp. 4-5).

In his deposition, Turner stated that Steggall's medical history shows he had reported chronic back pain for years prior to the fall, with chronic degenerative changes not unusual for a person of Steggall's age. (Filing No. 57-21 at CM/ECF p. 2). When asked whether he had a sufficient basis to causally relate Steggall's pain complaints to the January 4, 2015 fall, Turner responded that he would "have a hard time doing that" because there was not enough support in the record to define his pain level before the fall compared to after. (Filing No. 57-21 at CM/ECF p. 2-3).

From October 17, 2017 until June 25, 2018, Steggall visited Dr. R. Gregg Wilroy, Jr. to receive injections for his back pain. (Filing No. 57-22 at CM/ECF p. 3). In the recorded medical history, Wilroy listed the onset of Steggall's pain as "gradual without injury." (Filing No. 57-23 at CM/ECF pp.1, 4, 7 ) In his deposition, Wilroy stated that Steggall complained of lower back pain in 2005 and medical imaging from that time indicated degenerative changes. (Filing No. 57-22 at CM/ECF pp. 10-11) Wilroy stated that he had no opinion as to whether Steggall's back pain is causally related to the January 4, 2015 fall. (Filing No. 57-22 at CM/ECF p. 4).

On November 2, 2018, Dr. Jeffrey Sabin of Precision Orthopedics performed an independent medical exam on Steggall and he reviewed all pertinent medical records and discovery materials. (Filing No. 57-24). Dr. Sabin opined that Plaintiff's back pain "would likely not be from the subject accident fall issue at work that

13

occurred on 01/04/15 as the records would not indicate that the symptoms are proximate to that injury and in fact are delayed by 20 months." (Id., at p. 26). In addition, Sabin noted that "Drs Wilroy and Turner likewise, in their depositions, did not appear to be able to reconcile the patient's back issues to the subject fall." (Id.) In his deposition, Sabin was asked whether he had an opinion whether the fall played a part in producing a disc herniation at L2-L3. Sabin replied, "I don't have an opinion, no," affirming Steggall's "back issues are not from that fall. . . " (Filing No. 63-6 at CM/ECF p. 15).

The record indicates that Steggall had a work-related back injury in 1996, (Filing No. 57-4 at CM/ECF p. 2), and Steggall sought medical treatment for chronic and recurrent back pain in 1997, 2000, 2004, 2005, 2009. (Filing Nos. 57-4, 57-5, 57-6, 57-7, 57-8).

### b. Analysis

BNSF asserts that Steggall "has no competent evidence to show that his alleged back injury or back pain was caused by the Accident," and, as such, BNSF is entitled to partial summary judgment on that claim. (Filing No. 56 at CM/ECF p. 17).

To withstand a motion for summary judgment, nonmoving parties must substantiate their allegations with "sufficient probative evidence that would permit a finding in [their] favor." Anda v. Wickes Furniture Co., Inc., 517 F. 3d 526 (8th Cir. 2008). The "mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Madden v. Anton Antonov & AV Transportation, Inc., 156 F.Supp.3d 1011 (D. NE. 2015).

Under FELA, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the

slightest, in producing the injury or death for which damages are sought. Id. In FELA cases, expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury, unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile. [Brooks v. Union Pac. R. R. Co., 620 F.3d 896, 899 (8th Cir. 2010)](). Although the negligence of the defendant "need not be the sole cause or the whole cause" of the plaintiffs' injuries, FELA plaintiffs still must demonstrate some causal connection between a defendant's negligence and their injuries. [Claar v. Burlington, supra.]() Where an injury has no obvious origin, "expert testimony is necessary to establish even that small quantum of causation required by FELA." [Brooks, supra](), citing [Claar v. Burlington, supra.]()

Because Steggall's back pain does not have an obvious cause, expert testimony is required to establish that it was caused by or related to the fall on January 4, 2015. Steggall has offered no expert testimony that establishes, with a reasonable degree of medical certainty or probability, that his pain is related to that fall.

Upon reviewing Steggall's medical records, Sabin concluded that Steggall's back pain "would likely not be from the subject accident fall issue" on January 4, 2015. Steggall's treating physicians, namely Turner and Wilroy, did not have opinions as to whether Steggall's back pain is related to the January 4, 2015 fall, and Freidlein stated no opinion as to the back pain, as he treated Steggall for only a hip fracture. Additionally, Haque could not say, to reasonable degree of medical probability that Steggall's back pain was caused by the fall. Because Steggall has no evidence of causation linking the alleged lower back injury and pain to the fall, BNSF is entitled to partial summary judgment on Steggall's claims related to the alleged back injury or back pain.

Accordingly,

IT IS ORDERED:

1) BNSF's Motion for Leave to Supplement Defendant's Brief, (Filing No. 71), is granted, and its brief and referenced exhibits were considered herein.

2) BNSF's motion to exclude Brian Hansen's expert testimony (Filing No. 52) is granted.

3) BNSF's motion for summary judgment (Filing No. 55) is granted in part and denied in part, as set forth above.

Dated this 4th day of April, 2019.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge